JORDÁN, PLAINTIFF AND APPELLEE, *v.* RODRÍGUEZ, DEFENDANT AND APPELLANT.

### Appeal from the District Court of Arecibo in Injunction Proceedings.

No. 2346.—Decided December 18, 1923.

DEDICATION OF PROPERTY TO PUBLIC USE.—The owner of a house erected on the land of another person may construct, if the owner of the land does not object, a sidewalk or any other construction to serve the same purpose and, if he so desires, may dedicate it to public use. But the infrequent or more or less intermittent use by the public for a period of 16 or 18 years of a main wall or other construction built for some purpose which the owner knows best can not produce the effect of a dedication to public use.

INJUNCTION—IRREPARABLE INJURY.—The amount of damages has no effect on the right to an injunction, but the damages must exist and be irreparable and there must be some causal relation between the damages and the defendant or somebody under his authority.

The facts are stated in the opinion.

*Messrs. L. Feliú* and *I. Carballeira* for the appellant.

*Messrs. Lastra Charriez* and *Jiménez Sicardó* for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

The district court issued an injunction to restrain the erection of a concrete building in an advanced stage of construction, within the limits prescribed by a grant from the municipality, and in accordance with plans previously submitted to and approved by both the municipality and the Insular Department of Health.

The eleventh and twelfth assignments are that the court erred in overruling a motion for nonsuit and in entering a decree for petitioner. The findings and conclusions upon which that decree was based, after disposing of a number of more or less doubtful questions which we need not discuss, are as follows:

"That the Municipal Council of Manatí granted defendant Emilio Rodríguez the use, but not the ownership, of a lot 33 feet long by 92 feet deep in McKinley street, corner of Colón avenue, Manatí; that the city council authorized him to build on said lot, on which was a frame house belonging to defendant; that plaintiff Octavio Jordán Miranda is the owner of an urban property, where he and his family reside, at Colón avenue, almost in front of the lot granted the defendant; that the plaintiff was a member of the Municipal Assembly of Manatí at the time of the grant and voted against its concession to the defendant; that Colón avenue is an old street in public use since 1890 and that a sidewalk and gutter, also destined to public use, were situated in front of defendant's old frame building, the sidewalk having been laid more than twenty years earlier; that the department of sanitation approved a plan submitted by the defendant for the building on said lot; that said defendant began to erect a concrete house outside of the line of his old frame house, making use of the said sidewalk and gutter, and at a distance of 3.92 meters from the axis of Colón avenue, as was shown by measurements that were taken from sidewalk to sidewalk by engineers of the Insular Department of Sanitation when the latter learned that the construction was being made within less than five meters from the axis of the street; that when the defendant began to build Colón avenue was 7.84 meters wide from sidewalk to sidewalk according to measurements taken by said engineers; that prior to the application for injunction and without the knowledge of the Insular Department of Sanitation Colón avenue was widened in front of the site ceded the defendant and gutters were placed on both sides, the one on the east passing right into the plaintiff's property where the avenue has not been widened. The municipal ordinance of Manatí approved April 19, 1915, to which the plaintiff refers in his complaint and which relates to the constructions within the city, was not offered in evidence, and therefore the court is unable to take judicial notice of its existence. People v. Suárez, 23 P. R. R. 226, and People v. Nochera, 23 P. R. R. 561. But the court

may take judicial notice of the sanitary regulations adopted under the Act to reorganize the Sanitary Service approved March 14, 1912, section 15 of which provides that all courts may take· judicial notice of the adoption of such regulations and the publication thereof. In the employment of the words 'such regulations' in the said section reference is made not only to the regulations adopted by the Insular Board of Sanitation and set out in section 13, but also to those that may be adopted by the Executive Council under the provisions of section 14 when the said board fails to prescribe the same. Section 14 of the said act authorizes the formulating of regulations for the erection of buildings in towns.

"Sanitary Regulation No. 6 providing the sanitary conditions to be observed in the urbanization of lands in the Island of Porto Rico and· set out in the Proclamation of the Governor of Porto Rico of September, 1912, which is still in force and effect, prescribes in section 4 as follows:· 'In streets already laid out, and that are less than 10 meters wide, no buildings shall be erected at a distance nearer than 5 meters from the centre of the street.' It was proved by measurements taken by engineers of the Department of Sanitation prior to the application for injunction that the building was being put up at less than five meters from the centre of Colón Avenue, in short, that it was being erected at 3.92 meters from the centre of such street, which from sidewalk to sidewalk measures only 7.84 meters. The engineers also testified that the centre of the street had been changed subsequent to the filing of the application without any official knowledge thereof on the part of the Department of Sanitation.

"Section 7 of the Sanitary Regulation, under No. 6, provides: 'Each municipality shall, within a period of six months, prepare a plan of all lands already urbanized that are within the jurisdiction of the municipality and sanitary conditons of which do not comply with the provisions of the rules and regulations. In these plans shall be specified the changes which may be necessary to make such urbanized lands conform to the provisions of sections 3 and 4 of these rules and regulations, and after approval of said plans by the director of sanitation the municipality can only authorize those constructions in said urbanized lands which agree with the conditions specified in the above-expressed plans . . . . .' It is true that the plans of the urbanized lands referred to in this section; inasmuch as the street in question dates back to the year 1890, was not offered in evidence, but the testimony of the engineers in so far as the

same refers to the width of the street, was, in this regard neither contradicted nor excepted to, and therefore the court should consider the same to be true and make a finding of fact that the building was being erected at less than five meters from the center of the street.

"The Municipal Act in force has not repealed the Sanitary Regulations. Section 75 thereof only expressly repealed subdivisions 26 and 36 of the Act to Reorganize the Sanitary Service; and the the court is of the opinion that by empowering municipalities to pass ordinances and decrees in questions of public embellishment, alignment of streets, inauguration of parks, regulation of buildings, public thoroughfares, sewers and the concession of lots, the Municipal Law creates no conflict with Sanitary Rule No. 6, *supra,* which provides as a sanitary condition that when a street is less than ten meters wide no building can be erected at less than five meters from the center of said street. The locality of plaintiff's house, which was erected prior to the change in the line of the street by defendant's new building, is the most frequented place in the Municipality of Manatí and leads to the railway station. The change that in the line of the right-hand sidewalk was made without the knowledge of the Department of Sanitation affects the width of the street as it existed prior to the time the defendant began to build his house; and continuing the street downward, it narrows the same in front of plaintiff's residence so that if it were now sought to lay a street of the same width both at its begininning and center the garden and the steps of plaintiff's house would have to be demolished, thereby decreasing the present value of plaintiff's property as compared with its value when the construction was begun and the line of the street changed without the consent of the Department of Sanitation.

"The existence of the damage has been alleged and proved; the amount thereof has no bearing on the right to apply for and obtain relief. As stated by Mr. Justice McLeary in the case of Saldaña et al v. The Municipal Council of San Juan et al., *supra,* the pleading of damages to the amount of $1 or an eagle is of quite as sufficient value on which to base a suit as damages to the amount of $100 or 1,000 eagles.

"In the case in question it was held that the City Council of San Juan had no authority under the law to authorize any private person to construct a permanent building upon any of the streets, or sidewalks, or plazas of the city. If this cannot be done in San Juan,

neither can it be done in Manatí, and in Manatí leave has been given to a private citizen to build a house on a sidewalk dedicated to public use and at less than five meters from the center of the street, and in order to carry to excution this abnormal state of affairs it was necessary to make a new alignment of the street subsequent to the date this proceeding for injunction was begun.

"There are two fundamental facts that the court cannot disregard: (1) that a private citizen was allowed to build on one of the public sidewalks of the streets of Manatí, thus narrowing a public thoroughfare; and (2) that in order to permit of this a new alignment of the street and a new laying of the sidewalk was determined to the detriment of the adjoining owners on a direct line to the south, among whom figures the plaintiff. The first act was undertaken by the defendant, knowing—for nobody can plead ignorance of the law—that no person might build at less than five meters from the center of a street in Porto Rico, and the second, with a perfect knowledge that the authority granted municipalities was exercised according to the laws in force in Porto Rico and the United States, and that no ordinance or resolution or order in violation of any of such laws could prevail; that under the Organic Act the Commissioner of Insular Sanitation was in charge of all matters relating to public health, sanitation and charity, and that under the statutes in force the sanitary regulations partake of the character of law and are binding, subdivision 7 of Rule 6 providing that municipal ordinances hereafter promulgated by municipalities for the urbanization, opening and alignment of streets shall be in accordance with the terms thereof.

"There is no doubt that the Municipality of Manatí is empowered to change the line of its streets by adopting an ordinance to such effect, but to do this it must conform to the sanitary regulations governing the same and obtain the approval of the Commissioner of Insular Sanitation in connection with matters of public health and hygiene involved, as disclosed by subdivision 7 of Sanitary Regulation No. 6, supra.

"For the foregoing reasons the court is of the opinion that the law and the facts are in favor of the plaintiff, Octavio Jordán Miranda, and against the defendant, Emilio Rodríguez, and therefore sustains the application for injunction and as a consequence thereof makes the preliminary injunction of March 19, 1920, final and orders defendant Emilio Rodríguez to abstain, either personally or by any other person or employees, from building, working on, or con-

structing the house that he is erecting on the lot situated in Mc-Kinley street, Corner of Colón Avenue in Manatí, and measuring 33 feet in front and 92 feet in depth, until he demonstrates to the court that the house, conforming to the new line, is more than five meters distant from the center of Colón avenue and that the Municipality of Manatí has prescribed such new line and that the Department of Insular Sanitation has approved the same in keeping with the law and regulations in force regarding the matter, without special imposition of costs.''

Dr. Jordán purchased the house and lot fronting on Columbus avenue some two or three months before the date of the events complained of, and at the trial testified that as a member of the municipal assembly he had opposed the grant to Rodríguez because the contemplated house would narrow the street and prejudice petitioner; that after obtaining the concession, Rodríguez began to build upon the site alloted to him, making use of the sidewalk and the gutter; that witness knew the sidewalk perfectly, because he had lived at that place some three years; that it was used by the public; that witness had used it; that the width of the street was reduced because, Rodríguez having made use of the sidewalk and gutter, the axis of the street had to be changed; that the narrowing of the street was prejudicial to witness and to his family, because it is one of the most crowded spots in Manatí; that the property of witness had depreciated in value by reason of the variation in the line of the street; that various individuals, among whom witness could mention one who came to witness, upon hearing that witness was going to the States, in the belief that witness would sell the house, and after learning of the situation made no offer to buy; that they had changed the street, making a new sidewalk along the wall erected by Rodríguez; that this sidewalk extends into the street "because they have changed the line, for there was an existing line and they have changed that line and have a new one;'' that Rodríguez had been given about two meters, which

then had to be taken from the other side of the street; that what had been given to Rodríguez on one side of the street was taken on the other; that they have widened the street on the opposite side up to the fence enclosing the property of witness; that a further prolongation along the same line would cut off witness's garden and the steps in front of his house.

From the testimony of other witnesses for petitioner we take the following extracts:

Juan R. Santana testified:

"Q.—You said that it was being erected around an old house? A.—Yes, sir: some concrete walls.

Q.—In what manner? A.—On the eastern sidewalk of the street; that is to say, the sidewalk facing the west; the new building overlaps the sidewalk; the eastern wall of the house is erected on the border of the old sidewalk.

Q.—What sidewalk do you refer to? A.—The old sidewalk where the people walk to protect themselves from the rain.

Q.—What people? A.—The public.

Q.—Had they long been accustomed to walk there? A.—Yes, sir, a long time and they would get off by a step at the end of the sidewalk.

Q.—Had that sidewalk been in use a long time? A.—A long time; ever since the street was named; about sixteen or eighteen years ago.

*      *      *      *      *      *      *

Q.—What occurred in Avenida de Colón street when Emilio Rodríguez began to build that house in the manner he is now doing? A.—Of course the street was prolonged and another sidewalk was laid which overlaps the one that was in former use.

Q.—With what result? A.—And in order that the street might retain the same width, that section was taken from the sidewalk on the other side of the street and this is what has been done.

Q.—What happened when that section was taken from the other sidewalk. A.—If that line is continued it would be necessary to cut off the garden from Jordan's house according to the manner in which the plans are traced.

*      *      *      *      *      *      *

Q.—Is it or is it not true that the old sidewalk was made of stone? A.—It was paved with mortar and smoothed over.

Q.—But it was made of stone?  A.—Yes, sir.

Q.—How did that sidewalk compare in connection with the level of the street?  A.—It was a little high.

Q.—Is it true that at its extreme northern part the sidewalk was one meter high?  A.—Not exactly, it was one *vara* high.

Q.—A *vara* of three feet?  A.—Yes, sir; a Spanish *vara*.

Q.—Going in the direction of the railway station and supposing that an individual was traveling along that old sidewalk and arrived at the extreme north, what led to the railway station? A.—The road.

Q.—The lots?  A.—Yes, sir: one would go down the stairway and continue along the natural pavement.

Q.—Tell us, was there not close to that pavement or sidewalk a gutter for carrying off the rain water?  A.—There was an earthen construction which served as a gutter.

Q.—How deep was that ditch or gutter?  A.—It was not a foot deep.

Q.—Did it run along the whole length of the street?  A.—Yes, sir.

Q.—To whom did the old house there, around which the new house was built, belong?  A.—To Emilio Rodríguez.

Q.—Was it not he who made that old sidewalk?  A.—No, sir.

Q.—Who made it?  A.—That old sidewalk was constructed by Juan Rivero.

Q.—Are you sure of that?  A.—Sure that Emilio Rodríguez did not make it. I will explain, because a first cousin of mine was living in that house before it was occupied by Emilio Rodríguez and I used to go there often, and the sidewalk was already there.

Q.—When did Emilio Rodríguez buy that house?  A.—I do not know.

Q.—Then how do you know that prior to his occupancy your cousin occupied it and you visited the house?  A.—Because he was not occupying it and had no store there nor factory for curing tobacco.

Q.—Then the reason you do not know when he purchased it is because he had no store there?  A.—Yes, sir.

Q.—And yow know that prior to that you had a cousin there and that the sidewalk was constructed?  A.—Yes, sir.

Q.—Is it not a fact that you helped Octavio Jordán furnish the bond in connection with the preliminary injunction.

Attorney Jímenez Sicardó.—I object. I fail to see the pertinency of the question.

Court.—He may answer.

Witness.—I came here the same day he arrived, and when we got here we thought the furnishing of signatures would be sufficient and went to Gandía's and to Judge Lloreda's house. The latter said that he preferred cash and I answered that I could raise two hundred dollars and another person whose name I do not remember presented himself and said, ''I will give $200,'' and between the two of us we furnished the $400.

Q.—You say that the sidewalk is used as a protection from the rain. Was it protected? A.—Yes, sir, by the eaves that overhung the sidewalk.

Q.—And they were placed there as a protection from the rain? A.—Yes, sir: and from that point, when speakers arrived, I have greeted Muñoz Rivera on that very sidewalk.

Q.—You say that people used to shelter themselves from the rain; was it protected? A.—The very eaves of the house cover the sidewalk.

In answer to questions by Attorney Jiménez Sicardó the witness testified:

Q.—Has the fact that you were one of the sureties influenced your testimony or caused you to deviate from the truth. A.—I have limited myself to a statement of the facts. I am not an interested party.

Ettiene Totti testified:

Q.—Does the witness know whether subsequent to that permission Emilio Rodríguez built the house in question? A.—Emilio Rodríguez built the house at less than five meters from the middle of the street; the office was notified accordingly and we went to Manatí to investigate and took measurements showing that the building was not at a distance of five meters from the middle of the street.

Attorney Feliú.—I object. No one knows where the middle is.

Q.—Were you in the town of Manatí? A.—Yes, sir.

Q.—Did you measure the street? A.—Yes, sir.

Q.—What steps did the witness take for the purpose of making the investigation? A.—I measured the distance between the sidewalks to find the center of the street as such center is at an

equal distance between the two sidewalks and at times one sidewalk is wider than the other and the distance is taken from sidewalk to sidewalk.

Q.—What did you ascertain? A.—That the house was constructed at less than five meters from the center,—from the middle of the street.

Attorney Feliú.—Until the building line is shown by documentary and other evidence fixed by law, the testimony of this witness is immaterial and I ask that it be stricken out.

Court.—The question and the answer are admitted.

Attorney Feliú.—We except.

Q.—You may go on. How did you locate the middle of the street? A.—I arrived at Manatí and located the middle of the street in the manner stated and found that the house was being constructed at three and 92/100 meters from the center. I looked around and found that the old sidewalk was absorbed by the building. I went to the station and found that an old wooden fence was located 1.80 meter within the new line formed by Emilio Rodríguez' house and that the building line of the adjacent lots was within the old line.

Examined by Attorney Feliú, witness testified:

Q.—When you reached the street what you did was to measure from the edge of the sidewalk on the right of Avenida Colón in order that the street might retain that width. In moving the house of Emilio Rodríguez towards the East all the line has had to be changed.

Q.—Has there been a variation in the line of the street? A.—Yes, sir.

Gustavo Adolfo Ramirez testified:

Q.—What did you find? A.—I found that the house had overlapped the sidewalk; the sidewalk was within the building.

Q.—And what occurred? A.—That the house was less than five meters from the center of the street, in violation of the Sanitary Regulation.

Q.—What makes you say that? A.—Because I fixed the center of the street.

Q.—How? A.—Measuring from edge to edge of the sidewalks and measuring the distance from the center to the new building. The distance from edge to edge is 7.84 meters; thus the new building is being erected at 3.92 meters from the center of the street.''

Petitioner's deed, quoting the vendor, recites:

"That she is the owner of the following property: Urban: one-story frame house, with balcony in front, of zinc roofing, 10.50 meters in front by 15 meters deep, on her own lot and situated on the street known as Avenida Colón of the town of Manatí, 13.60 meters in front by 17 meters deep, the house and lot being bounded on the right side entering or south, by the Succession of José Ramón González, now Selgas & Company; on the left or north by a lot and house of Joaquina Felicier; on the rear or east by lands of Jaime Calaf, and on the front or west by Avenida Colón street.

"*Title.*—She took title under community rights and by inheritance from her deceased spouse, Salustiano Villamil, as recorded on page 176, volume 13 of Manatí, property No. 713."

The statement of witness Santana leaves us somewhat in doubt as to whether the so-called sidewalk was used primarily for the purpose of travel or as an incident to the shelter afforded by the overhanging eaves of the building alongside. Something more of detail as to the purposes of the cousin and former owner of the building in constructing the "sidewalk" would have been more to the point. It would also be interesting to know something more definite about the stairway at the end of the "sidewalk," as, for instance, whether the steps were expressly designed and made by the former owner for the convenience of the public, or were a mere accident of construction, or were worn by time and weather or by public use, or were improvised by some public-spirited citizen as a means of access to this curiously constructed "sidewalk."

Sidewalks, as a rule, follow and conform more or less to the grade of the street. Facts are stubborn things. No ordinary witness can convert a stone wall into a sidewalk merely by referring to it as a sidewalk. Nor is any court obliged to adopt such a characterization when all the circumstances tend to negative the conclusion involved therein.

The owner of a house standing upon the land of another, if the owner of the soil does not object, may place thereon

a sidewalk or any other structure available for use as such, and, if he chooses, dedicate the same to public use. But the occasional or more or less intermittent use by the public, for a period of sixteen or eighteen years, of a retaining wall or other structure erected for some purpose best known to the owner cannot, without more, operate such a dedication.

If the evidence for petitioner had shown that Columbus avenue was originally a flat boat canal, with a system of locks and dams, the theory of a solitary segment of sidewalk with a stairway at one end would seem somewhat more plausible.

The inaccuracy of the assertion that the testimony of the sanitary engineers, Totti and Ramírez, was admitted without objection, will at once appear from a perusal of the extract from Totti's statements, *supra*. The objections made were not so persistent, perhaps, as might be necessary to establish a basis for reversal on the sole ground of error in admitting the testimony in question, but they were more than enough to call the attention of the court to the intrinsic want of any probative value. Even a total failure to object to such testimony could neither lend any additional strength thereto nor justify the court below in accepting as true statements obviously based upon worthless data. The finding that Rodríguez built within less than five meters from the center of a street less than ten meters wide has no foundation whatever, other than the ascertained distance between one ditch and another, or between a ditch and a bank of earth, in the soft alluvial soil of our coastal plain.

We quite agree with the court below that the amount of damage is not a determining factor, but there must be some damage, and *that* damage must be irreparable in its nature. Also some causal connection must exist between such damage and the defendant, or some one under his control. Accepting for the purposes of this opinion the congested condition of traffic on Columbus avenue as pictured by pe-

titioner in his testimony, yet the complaint is not that the street is narrower than before, but that the municipality may eventually expropriate a portion of petitioner's front yard. It is true that at first petitioner was apprehensive for the safety of his children, but his own testimony, as well as that of other witnesses put on the stand by him, shows the actual existence of a better and wider street with concrete sidewalks on both sides instead of the stone wall previously standing on the side opposite petitioner. Conceding, for the sake of argument, that the failure to receive an offer of purchase, which perhaps might have been made if the former *status quo* had been preserved intact, is the proper method of showing the depreciation in value, yet it seems hardly probable that the loss of such prospective offer was due either to the location of the eastern wall of defendant's building or to the generally improved surroundings. Any appreciable depreciation in value of petitioner's property could be accounted for only by the possibility more or less remote that the municipality may at some time in future undertake to confiscate a portion of the land inclosed by petitioner's fences. To hold defendant herein responsible for any such conjectural result, not of his own action but of acts performed or threatened by the municipality, with which he has had, and has, nothing whatever to do, would extend the extraordinary remedy of relief by injunction over a large area of new and hitherto undiscovered territory.

Section 2 of the Regulations, upon which so much stress is laid by the court below, refers to lands the urbanization of which is contemplated. Section 3 provides that all streets laid out on such lands shall be at least ten meters wide. Section 4, in the paragraph relied upon, speaks of streets already laid out, and that are less than ten meters wide. Section 7 reads thus:

"Sec. 7.—Each municipality shall, within a period of six months, prepare a plan of all lands already urbanized that are within the

jurisdiction of the municipality and sanitary conditions of which do not comply with the provisions of the rules and regulations.

"In these plans shall be specified the changes which may be necessary to make such urbanized lands conform to the provisions of sections 3 and 4 of these rules and regulations, and after approval of said plans by the Director of Sanitation the Municipality can only authorize these constructions in said urbanized lands which agree with the conditions specified in the above expressed plans.

"All owners of ground plots and buildings comprised within said land shall be notified as soon as the plans above alluded to have been prepared, in order that they may examine them and present any comments which they consider advisable for the consideration and resolution of the municipalities.

"Ordinances which may be prepared in future by municipalities pertaining to the urbanization, opening and alignment of streets must harmonize with the provisions of these rules and regulations which shall not be understood as altering the powers vested in the municipalities, in accordance with the law, to regulate other matters relative to the urbanization of lands which do not affect the public health.

"Any one violating any of the dispositions of these rules and regulations shall be punished in accordance with section 33 of the Law of the Sanitation, in effect since April 1, 1912."

There is nothing whatever in the evidence adduced by petitioner to show that Columbus avenue was ever "laid out," or that the municipality of Manatí ever submitted to the Department of Health for its approval any plans whatsoever, or that the Department had ever approved any such plans, or that the municipality of Manatí had ever granted any building permits at variance with such plans, or that defendant, or any other owner of property abutting on Columbus avenue, was ever notified of the existence of any such plans or of any action contemplated or taken thereon, or that the municipality had ever passed any ordinance relative to the opening or alignment of any street not in harmony with the provisions of the said regulations.

It was not the fault of defendant herein if the municipality of Manatí never filed plans with the Department of

Health, or if that department approved building plans and specifications submitted to it something less than a decade after the promulgation of the Regulation of 1912, in the absence of any such plans and without a preliminary survey or inspection of the premises. The time for the Insular Department of Health to take measurements upon the grounds, if any were to be taken, was before the approval of the plans submitted to it, and not after the construction of an expensive concrete building was well under way if not nearing completion.

Nor do we find a scintilla of evidence to sustain the conclusion reached by the court below that the new alignment or widening of the street resulted in injury to other owners of property in a "direct line toward the south." It is, on the contrary, a most significant circumstance that none of these neighboring property owners has either joined petitioner in his protest or appeared as a witness in the case.

The motion for a nonsuit should have been granted.

In view of the conclusion reached upon this point we need not discuss the evidence for defendant. It would suffice to say that if there be any doubt as to the error of the court below in overruling the motion for nonsuit, there can be none as to the proposition that the decree is not sustained by the evidence as a whole.

We may add, however, that defendant, in addition to a history of the origin and purpose of the stone wall, showed by uncontradicted testimony that the survey and plans for paving and improving Columbus avenue were made at or before the time of the grant to defendant; that the house on the corner opposite defendant's building had stood for thirty years or more upon that site, the ground itself being owned in part by the owners of the superstructure; that the space between this older building and the "curb" arbitrarily selected by the sanitary engineers as a street boundary line, was simply a strip, or bank, of bare soil; that no previ-

ous survey had ever been made, nor any building line or regulations in regard thereto established; and subject to such contradiction as is contained in the extracts from the testimony for petitioner, *supra*, that the improvements actually made tended to facilitate traffic, present a more pleasing appearance to the eye, enhance property values and, in general, to ameliorate existing conditions in the neighborhood. Petitioner's deed calls for the old corner building, or the lot upon which it stands, as a boundary on one side, but there is no evidence whatever to show when petitioner's house was built, or to explain why his own front yard fence is so much nearer the "axis of the street" than is the building line upon which this ancient corner building was erected.

The most salient fact in the case is the total absence of any established building line, unless it be that indicated by the old corner building opposite defendant's property and utterly ignored both by the sanitary engineers and by the court below.

It is fair to say that the proprietary district judge did not sit in this case and that the substitute judge who presided had convicted defendant of a criminal offense involving the events which gave rise to the present controversy. *People* v. *Rodríguez,* 29 P. R. R. 308. Counsel for defendant herein did not participate in the trial of the criminal case. Perhaps the prosecuting attorney brought out circumstances that were overlooked by attorneys for petitioner herein. Possibly the defence was not so fully developed by cross-examination, or otherwise, in the criminal case. Some confusion of the evidence in the two cases, existing in the mind of the trial judge, may be the true explanation of the result below in the case at bar. But be this as it may, we cannot, of course, dispose of the present appeal upon evidence adduced in another and probably, as made, very different case.

The judgment appealed from must be

*Reversed.*

Chief Justice Del Toro and Justices Wolf and Aldrey concurred.

Mr. Justice Franco Soto took no part in the decision of this case.